ESTATE OF JOHN FREDERICK DAVIS, Deceased; FIRST NATIONAL BANK OF OMAHA, Executor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Davis v. Commissioner
Docket No. 1636-76.
United States Tax Court
T.C. Memo 1978-69; 1978 Tax Ct. Memo LEXIS 442; 37 T.C.M. (CCH) 341; T.C.M. (RIA) 780069; February 23, 1978, Filed *442 Kent O. Littlejohn, Michael L. Sullivan, Ronald C. Jensen, for the petitioner. Ronald M. Frykberg, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined a deficiency in estate tax of petitioner in the amount of $255,236.09. All other issues having been resolved by agreement of the parties, the sole question remaining for determination is the fair market value as of the date of death of the decedent of 28,938 shares of First West Side Bank of Omaha, Nebraska, directly or indirectly owned by the decedent. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. The decedent, John Frederick Davis (hereinafter referred to as the decedent) was born on June 22, 1910, and died testate on March 23, 1972. At his death, Davis was a resident of Omaha, Nebraska. Decedent's last will and testament was admitted to probate in the County Court of Douglas County, Nebraska. The First National Bank of Omaha (petitioner) was appointed and is now the duly qualified and presently acting Executor of the Estate *443 of John Frederick Davis. Letters testamentary were granted the petitioner on May 9, 1972. Petitioner, as Executor of the estate, timely filed a Federal estate tax return with the District Director of Internal Revenue at Omaha, Nebraska. On the date the petition was filed herein, the petitioner had its principal office in Omaha, Nebraska. On March 23, 1972, the date of decedent's death, decedent directly owned 25,708 shares of the common stock of First West Side Bank of Omaha, Nebraska (hereinafter referred to as the Bank). The decedent also owned all of the stock of Dalar Corporation, which in turn owned 3,230 shares of the stock of the Bank. Decedent thus owned directly or indirectly a total of 28,938 shares of the stock of the Bank. As of March 23, 1972, the Bank had outstanding 75,000 shares of common stock, which were owned as follows: Stockholder
No. of Shares
Stanley J. Bednar
9,375
James Irving
7,499
Farmers & Merchants Bank,
Bloomfield, Nebraska
1,515
Emerson Insurance Agency
1,515
Blair Insurance Agency
1,665
W. E. Jahde
150
John Frederick Davis
25,708
John R. Lauritzen
24,243
Dalar Corporation
3,230
Ronald L. Hale
50
Patrick M. Conway
50
Total Outstanding
75,000
*444 John R. Lauritzen was decedent's brother-in-law. Farmers & Merchants Bank, Emerson Insurance Agency, and Blair Insurance Agency were controlled by Mr. Lauritzen. Thus, 28,938 shares of the Bank were owned or controlled by Mr. Lauritzen. Pursuant to restrictive agreements between various other shareholders and decedent and Mr. Lauritzen, decedent and Mr. Lauritzen had a right to purchase, in equal shares, the stock of such other shareholders as might offer their stock for sale. The purpose of such agreements was to maintain, insofar as possible, equality of ownership between the decedent and Mr. Lauritzen. The shares owned by Stanley J. Bednar were subject to an agreement that if he desired to sell or transfer his shares, or upon termination of active participation in the Bank, he was required to offer them for sale to the remaining stockholders in proportion to their holdings at a price equal to the adjusted book value of the stock determined by formula. The shares owned by James Irving were also subject to an agreement that if he desired to sell or transfer his shares, or upon termination of active participation in the management of the Bank, he was also required to offer *445 them for sale to decedent and Mr. Lauritzen (50 percent to each) at a price equal to the adjusted book value of the stock determined by formula. An agreement dated October 13, 1960, between decedent and Mr. Lauritzen provided as follows: This agreement is made and entered into this 13th day of October, 1960, by and between JOHN F. DAVIS, hereinafter referred to as the First Party, and JOHN R. LAURITZEN, hereinafter referred to as the Second Party. WHEREAS, the first and second parties are presently the owners and holders of sixty-two per cent of the authorized and issued capital stock of First West Side Bank, each owning an equal amount; and WHEREAS, first party and second party have expended capital and devoted their energies, skill and talent to the development of the First West Side Bank; and WHEREAS, first parties desire that the First West Side Bank should continue to receive their joint attention during their lives and the attention of the survivor after one of them is deceased; and WHEREAS, the first party and second party wish to avoid any difficulty or inconvenience which might be encountered should the stock of either of them pass into other ownership without *446 their consent; NOW THEREFORE, in consideration of the mutual agreements and promises contained herein and for other valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows: 1. The provisions of this agreement shall apply to any and all shares of capital stock of the First West Side Bank of Omaha, Nebraska, that are presently owned or hereafter acquired and irrespective of the manner of acquisition. 2. During the joint lives of the parties, they promise and agree to and with each other that neither of them shall or will, during the life of the other, sell or otherwise transfer his shares of said stock or any portion thereof to any person, corporation, or other legal entity not a party to this Agreement except as hereinafter provided. 3. Should the parties wish to sell or transfer said shares or any portion thereof to certain corporations in which they alone, or together with their respective wives and/or children, own a controlling interest they may do so; however, such a transfer may be made only after the corporation acquiring said shares has agreed in writing to be governed in strict accordance with the provisions of this Agreement *447 as though it was a party hereto and after a resolution to this effect has been passed by its Bard of Directors at any regular meeting of said Directors or at a special meeting called for this purpose pursuant to its Articles of Incorporation or By-Laws. A copy of the corporate assent to so be bound by the provisions of this contract, together with a copy of said corporate resolution, both duly signed by the President and Directors, will be delivered to the party not participating in the transfer of said shares before any such transfer is consummated. 4. During the joint lives of the parties, should one of them desire to dispose of said shares of stock to anyone except his wife, one or more of his children, or a controlled corporation, as referred to in the preceding paragraph, the shares must first be offered to the other party and the offer shall be made in writing. The party to whom the offer is made shall have six months from the date of the offer within which to purchase said stock at a price per share determined by the sum of the capital, plus the surplus; plus the undivided profits; plus all unaccrued reserve accounts whether allocated or not after deducting taxes which *448 would have been payable had such reserves been then transferred to undivided profit; plus or minus the net bond profit or loss, after taxes, computed as though said bonds had been sold at market; plus 10% of the total value thus obtained. This total, after the addition of said 10%, shall then be divided by the total number of issued and outstanding shares of First West Side Bank; all determined as of the date the offering party notifies the other party of his intention to offer said stock for sale. 5. At the expiration of said six month period, if the party to whom said offer has been made declines to purchase said stock then it may be offered for sale to the public or otherwise at the discretion of the party desiring to sell, except that in such event, each stockholder of the First West Side Bank, except the seller, shall have the right of first refusal with respect to any offer of purchase received by the selling party and all such stockholders, except the seller, shall have the right to purchase a proportion of such stock equal to the ratio of the number of shares owned by him to the total shares owned by the remaining shareholders, excluding the seller, at the same price per *449 share as has been offered the selling party, or they may purchase the shares offered for sale in whatever proportion they may, among themselves, agree; however, all said shares being offered for sale by the selling party must be purchased by the remaining stockholders enjoying said rights of first refusal. Should said stockholders agree to purchase all of the stock of the party selling, they shall indicate their intention to do so in writing and shall buy said shares within ninety days from the date the from the date the party selling has notified them in writing of their option to exercise their right of refusal and the price which he has been offered. If the party to whom said stock is initially offered declines to purchase said stock, either specifically or by lapse of time, as provided in Paragraph 4, above, and if the remaining stockholders fail to purchase the shares of the selling party within the time prescribed, then the provisions of this Agreement shall no longer be binding upon the party selling the shares. 6. It is further provided, however, that should either the first or second party wish to sell, give or otherwise transfer said shares to either their wife, children *450 or a controlled corporation, as referred in Paragraph 3, above, they may do so subject to the provisions of this Agreement, and said wife or children shall hold the shares of said stock subject to the provisions of this Agreement and in the precise manner as though said stock was still owned by either the first or second party. 7. All certificates of stock of the First West Side Bank owned by either of the parties, whenever acquired, shall plainly indicate on the face of said certificates, as follows: "The shares of stock represented by this certificate are subject to the terms of an Agreement dated October 13, 1960, a copy of which is on file with the Trust Department of First National Bank of Omaha, Nebraska." 8. The provisions of this Agreement shall be binding upon the executors, administrators, heirs, or assigns of the parties. 9. This Agreement may be amended or altered in any provision and such change shall become effective when reduced to writing and signed by the first and second parties. This Agreement is executed in Omaha, Nebraska, on the date first above written. The Bank was organized under the laws of Nebraska in 1954. At the time of decedent's death, *451 the Bank was a highly successful commercial banking operation located in the immediate area of the Crossroads Shopping Center, approximately six miles west of downtown Omaha. The Bank's main offices were located in a three-story building which was remodeled and substantially expanded in 1969. The Bank also maintained a banking facility within the shopping center. At the date of decedent's death, the Bank ranked as the sixth largest commercial bank in Omaha in terms of total deposits.The Bank's total deposits were as follows: Total Deposits Date
(Millions)
December 31, 1967
$21.1
December 31, 1968
26.6
December 31, 1969
28.1
December 31, 1970
32.0
December 31, 1971
36.2
March 23, 1972
37.1
The Bank's financial condition at December 31 of the years 1967 through 1971 was as follows: (000 omited) 1971
1970
1969
1968
1967
Assets: Loans
$23,322
$20,926
$21,336
$16,237
$13,612
Government obliga-
tions
10,109
6,721
5,261
8,741
6,927
Other
7,121
8,329
5,154
4,105
2,768
Total assets
$40,552
$35,976
$31,751
$29,083
$23,307
Liabilities: Deposits
$36,167
$31,976
$28,116
$26,576
$21,112
Other liabilities
1,099
1,073
1,024
385
434
Reserves
378
319
350
Capital accounts
2,908
2,608
2,261
2,123
1,761
Total liabilities,
reserves and
capital accounts
$40,552
$35,976
$31,751
$29,083
$23,307
Book value per share
(75,000)
$38.78
$34.77
$30.14
$28.30
$23.48
*452 During the years 1967 to 1971, inclusive, the only dividend paid by the Bank was a distribution in cash of $1.00 per share in the year 1971. As of the close of business on March 23, 1972, the daily statement of the Bank reflected the following: Assets: First National Bank, Omaha
$ 4,033,605.84
Omaha National Bank, Omaha
16,939.16
Cash
467,417.99
Total Cash -- Subtotal
4,517,962.99
Cash Items Not in Process of Coll.
- 422,524.22
U.S. Government Bonds
4,399,371.87
Fed. Fds.
950,000.00
Municipal Bonds
6,511,151.28
Israel Bds.
20,000.00
Overdrafts
56,156.98
Commercial Loans
10,293,958.94
Real Estate Loans
4,636,325.09
Installment Loans
8,773,083.12
Furniture and Fixtures
175,576.59
Leasehold Improvements
902,665.98
Interest Earned, Not Collected
310,970.81
Income Accdued, Not Collected
3,756.42
Prepaid Expenses
2,358.60
Accrued Expense--Taxes, Interest, etc.
551,979.41
Bank Premises
512,954.52
Difference Account
537.43
Customer Postal Guarantee
15,855.00
Short Account
186.78
Total Assets
$42,212,327.59
Liabilities: Deposits
$37,143,589.48
Capital
1,500,000.00
Surplus
542,500.00
Undivided Profits
705,178.70
Reserve for Losses on Loans
1.00
Reserve Personal Loans
435,377.95
Reserve for Taxes, Interest, Insurance
257,235.06
Postal Guarantee
15,855.00
Bond Interest
109,691.35
Loan Interest
244,740.60
Personal Loan Interest
117,800.00
Dealer Loan Interest
46,796.41
F.H.A. Interest
13,899.34
Service Charges and Collections
100,494.34
Exchange
3,539.97
Safety Deposit Rental
4,369.90
Rental Income
12,699.00
Interest Collected, Not Earned
958,555.49
Total Liabilities
$42,212,327.59
*453 In the estate tax return of decedent, the 25,708 shares of the Bank directly owned by decedent were valued at $36.00 per share. In the statutory notice of deficiency, respondent determined the shares had a value of $75.00 per share. The same valuation was likewise adopted by respondent in the determination of the value of the stock of Dalar Corporation. At the date of decedent's death on March 23, 1972, the 28,938 shares of the common stock of First West Side Bank owned or controlled by the decedent had a fair market value of $45.00 per share. OPINION The decedent died on March 23, 1972, owning or controlling 28,938 shares of the common stock of First West Side Bank, being 38.58 percent of the total stock outstanding. Mr. Lauritzen, decedent's brother-in-law, also owned 28,938 shares of such stock. By agreement with the other stockholders, provision was made for the decedent and Mr. Lauritzen to acquire any additional stock which might be offered for sale in equal shares. The only question for decision is the determination of the fair market value of the decedent's stock of the Bank as of the date of decedent's death. In the decedent's estate tax return, such stock was *454 valued at $36.00 per share. In the notice of deficiency, respondent determined a value of $75.00 per share. Petitioner presented the opinion of an expert witness who testified the fair market value of the stock was not more than $28.00 per share. Respondent countered with an expert witness who testified that the fair market value of the stock was no less than $59.00 per share. The Court is thus faced with a wide variance of opinion as to the value of the stock in question. The determination of the fair market value of decedent's stock as of March 23, 1972, requires a conclusion of fact based upon the record before the Court.In light of the testimony of respondent's witness, no presumption of correctness attaches to respondent's determination of the notice of deficiency that the fair market value of such stock was $75.00 per share. It is for the Court to determine that value under the hypothetical assumption as to the price at which the stock would change hands in a negotiation between a willing seller and a willing buyer, neither of whom was under any compulsion to buy or sell. In making that determination, however, consideration must be given to the conditions attaching to any *455 sale of the stock, namely, the restrictive agreement between petitioner and Mr. Lauritzen. Respondent argues, without much conviction, that the restrictive agreement did not survive the decedent. To so hold would defeat the very purpose sought to be achieved by the decedent and Mr. Lauritzen, jointly to be in a position to direct and control the affairs of the Bank. Petitioner's expet witness testified that in his opinion, the fair market value of the stock on the basic date was not more than $28.00 per share. His opinion was predicated solely upon his judgment, in the light of offerings of bank stocks in relation to price earning ratios, book value, and dividend yields. His only knowledge of the area served by the Bank was derived from a brief visit during which he rode around the area in order to acquaint himself with the demographics of the neighborhood. Except for this visit, he was a stranger to Omaha. He assumed that the purchaser would have little information in regards to the stock of the Bank, except for the financial statements filed with the regulatory agencies. He thus failed to take into account the likelihood, if not the fact, that in a transaction between a *456 buyer and seller involving 38.58 percent of the total stock outstanding, detailed information in regards to the operations of the Bank and the conditions of its loan portfolio would be taken into account. Petitioner's expert witness likewise failed to attach any significance to the fact that decedent's stock constituted 38.58 percent of the total stock outstanding. While a purchaser of such a block of stock could not exercise control without an accommodation between the purchaser and Mr. Lauritzen, the same was true to Mr. Lauritzen, who also owned or controlled 38.58 percent of the Bank's stock. For all practical purposes, between them they owned the Bank. We are not dealing with the sale of a few hundred shares of the stock which carry with them no voice in the management of the Bank. Petitioner's expert witness stated that in his opinion the most important consideration was book value. When this statement is coupled with the disparity beteen the value of $28.00 per ahre, as testified to by the witness, and a book value of $38.00 per share, the Court is inclined to give little weight to the testimony of the witness. The respondent's expert witness was likewise a stranger *457 to the area. His opinion was predicated largely upon quoted prices for bank stocks and stocks of bank holding companies in buy or sell offerings. On that basis, he assumed that 10 times 1971 earnings would be a fair price for stock. In his testimony, this witness failed to give effect to the restrictive buy and sell agreement between the decedent and Mr. Lauritzen. He sought to avoid the apparent ceiling imposed on any sale of the stock by that agreement on the assumption that in the event of a sale Mr. Lauritzen would join with the decedent and offer absolute control of the Bank in order to attain the maximum price. There is no basis to support that assumption. In the final analysis, however, respondent's expert witness predicated his opinion of value on the further assumption that, joined by Mr. Lauritzen, decedent's stock will be exchanged in a tax-free transaction with First National of Nebraska, Inc., a transaction which was not as of March 23, 1972, or as of the date of the trial, permitted by Nebraska law. It is on the basis of that assumption that respondent's expert witness places a value of $59.00 per share on the decedent's stock. Since the assumption was not predicated *458 either on the conditions which prevailed on March 23, 1972, or on a reasonable expectation as to the future, the opinion of this expert is of little value. As a starting point, the Court would have preferred to have the opinion of the appraiser who valued the stock at $36.00 per share in the estate tax return. Presumably, he was knowledgeable of the local market and the value of the Bank's stock in the Omaha business community. Unfortunately, petitioner did not present the testimony of that appraiser. The Court is not convinced that the stock should be valued at less than book value as of the date of death. The Bank had experienced a steady year-to-year growth. It was a highly liquid condition, with outstanding loans being divided almost equally between governmental obligations, commercial loans, and real estate and installment loans. Looking at the daily statement as of March 23, 1972, a prospective purchaser would have every reason to believe that the book value of the stock reflected sound banking practices and that value was not in jeopardy. As a purchaser of 38.58 percent of the total outstanding stock, he undoubtedly would also have access to additional information. *459 In the absence of any proof to the contrary, the Court can only assume that such information would be consistent with the daily statement. While there is some difference between the parties, and neither side has presented proof with respect to what value would be attributable to the stock if the formula provided for in the restrictive agreement were to be applied as of March 23, 1972, there is indication that a sale pursuant to the agreement between the decedent and Mr. Lauritzen, as of the valuation date, would be made at a price of approximately $45.00 per share. Respondent argues that the price which would result from the application of the formula in the restrictive agreement does not impose an absolute ceiling on the maximum value which might be attributed to the stock, citing . As was pointed out in that case, there may be some difference of opinion with respect to the weight to be attached to the restrictive agreement. Under the circumstances of this case, however, and in the absence of any showing that the restrictive agreement was a substitute for a transfer of interest subject to the estate *460 tax, the circumstances are indistinguishable from . It is unreasonable to assume that decedent might realize a price for the stock which would be materially in excess of the price provided by the formula without the cooperation and participation of Mr. Lauritzen. Furthermore, the formula was agreed upon between the decedent and Mr. Lauritzen, both knowledgeable with respect to this Bank and to the banks in the area, and neither intending to take advantage of the estate of whichever might die first. It is obvious that their intent was to provide for the retention of control of the Bank by the survivor on a fair and equitable basis. On the record before the Court, a hypothetical value arrived at as a result of the formula agreed upon between the two constitutes the best evidence available. Upon a consideration of all of the evidence, the Court finds that the fair market value as of March 23, 1972, of decedent's interest in the First West Side Bank of Omaha, Nebraska was $45.00 per share. Decision will be entered under Rule 155.